The sole assignment of error relation to the refusal to grant a new trial, the motion therefor being based on the general grounds only, there being sufficient evidence to support the verdict, and the same having the approval of the trial judge, the judgment is affirmed. Goolsby v. State, 196 Ga. 188
(26 S.E.2d 181).
Judgment affirmed. All the Justices concur.
 No. 14589. JULY 7, 1943.
Charlie Sexton was found guilty, without recommendation, of the murder of Ernest Clonts by beating and shooting him with a shotgun, and the death penalty was imposed. The motion for new trial contains only the general grounds. A new trial was refused.
Tobe McGarity testified, in effect, that Clonts and Sexton would ride with him on his truck to and from work at the bomber plant near Marietta, Georgia; that in the presence of the defendant on the day of the homicide, on a Thursday, Clonts said he was going to draw all his money, check out, and go to the army, and on their ride home together Clonts showed a $10 bill, gave the witness $2 for riding with him, received $8 change, and Clonts had another bill in his pocket-book; that Clonts had with him a flashlight; that Clonts and the defendant got out of the truck together, and about an hour later, after hearing that Clonts' body had been seen, the witness saw him lying dead in the road, "his head was torn all to pieces, . . the skull was crushed and the bones bursted in — that was such a wound as could have been made by a gun-barrel used as a weapon or club, . . the print was round like a gun-barrel and the size compared to a gun-barrel . . beside the wounds I have described . . he was shot in the back, right along there in the center of his back . . the wound was a gunshot *Page 299 
wound;" that it was muddy, rainy weather, and the defendant had on Sam Smith's, his stepfather's, raincoat when he got out of the car. This witness further said that he had never heard any argument between the defendant and the deceased, and had "never seen Clonts with a switch-blade knife or any knife at all."
Ray Jones testified that he saw the body of Clonts lying in the road. "He was still breathing. . . I didn't see anything in his hands at all. I didn't look for a weapon." He had previously heard from the same direction a shot "like a shotgun," and after that "something that sounded like somebody hollering, a hollering and squalling sound three times." He saw nobody passing in that direction.
Everett Walton testified as to seeing the body of the deceased in the road, and its condition, and seeing what was taken at that time from the pockets and body before it was moved, consisting of papers, check-stubs, cigarettes, a matchbox, flashlight batteries, keys, and one penny.
Riley McClung testified as to finding gun-wadding for number 8 shot of a shotgun shell near the body, and finding the next day a "pocket-book over in the pasture something like a quarter of a mile from where the wadding was;" that going in the direction where the defendant and his stepfather, Sam Smith, lived, across the field and into the pasture, the witness and others followed "tracks as they went off from the killing," and some of them found a gun-stock, as the defendant had said they would, under some broom-straw mashed down over it; that the pocket-book was under a little wad of dirt, and contained a registration card of the deceased and something like fifteen cents.
Tom Garmon, a deputy sheriff of Paulding county, testified as to seeing the body of the deceased in the road, and finding only one penny with other articles on his person; that the witness and others went that night to the house where the defendant lived with his mother and Sam Smith, a stepfather; that they found there a raincoat with "some mud on it, and down on the corners of the coat at the bottom, there appeared to be some spots of blood, then on the back of the coat, between the shoulders, there was a piece of flesh or something about that long [indicating] and about half that big, stuck to the raincoat;" that they asked about a shotgun, which the defendant said had been there that morning; that the stepfather *Page 300 
said in the defendant's presence that the defendant had been wearing the raincoat that day, and the defendant admitted having worn it; that they put the defendant and his stepfather in a car and "went back where the negro boy was killed at, and got out and showed him the place," and the defendant first said that he had been "on top of a little rise, and heard somebody running back out the road and heard a gun shoot, and said he went on home;" that they "had not accused him of it. We got back to the car and got in the car, and come on down the road to the house, and we told him to come on and tell us, and we would let Sam [the stepfather] out. He says, `All right, let him out, I done it.' Then we asked him about the gun. He says, `I throwed the gun down between where I killed him and the road that goes down by Mr. Alexander's in the woods;'" that they made no threats against the defendant and offered him no hope of reward or fear of punishment to get him to make the statement, did not promise him anything, and "he made the statements freely, voluntarily, of his own accord, when we would ask him. He said he threw the gun up in the edge of the woods between where he killed him and what we call the ridge road that Mr. Alexander lives on. It was dark, and we come on home, and next morning me and Mr. Camp went back down there, and he said after he shot the negro he run back out toward the Kennedy house a little piece and then turned across the filed, and we . . struck his track, and Mr. Camp found the gun barrel. The track was about the same place he said it would be. It was a boot track. He had on a pair of boots when we got him. . . As to the comparison of the tracks that we examined and the boots he had on, it looked to be the same, same size and shape; . . it is just a rubber bottom. . . After we made our examination with him there the first night, and our flashlight batteries gave out, we came to town and brought him with us. . . Some of them asked him what the trouble was, and he said they had been quarreling about a dog, about Willard Driscoll's dog being shot . . a few days before; he said the deceased [Ernest Clonts] had accused him of telling Willard that he shot the dog, and he said Ernest made a lick at him with a switch-blade knife, and he jumped under his arm and shot him. When we examined the dead man and surroundings, we didn't find a switch-blade knife. We examined Ernest Clonts when we picked him up. I saw no switch-blade knife. He *Page 301 
said he didn't shoot him in the head; he said he shot him in the back. . . That was all his statement at that particular time. . . We went back next morning; . . he says, `I just throwed the gun stock off that way, above where the barrel is,' and we was going across the field and he found it on the terrace. To reach the point where the barrel was found, we followed the tracks. . . The gun-barrel was, about three or four hundred yards from where he killed the negro. . . He had just jabbed it under the top of the ground and left the hammer part stuckout out of the ground. . . We hunted for the stock up above where he said he throwed it, and we couldn't find it, and come on back to town, and all the time he was denying that he even got the flashlight and the other stuff. . . [We] talked to him down in the jail, and asked him about the flashlight and the pocket-book. He didn't make any statement then with reference to those. Then we told him about finding the flashlight, and he owned up to it, and he says, `Yes, I got the flashlight,' but he still denied the pocket-book;" after asking him more about it, he said, `Give me till in the morning, and I will get it for you, . .' and I asked him, `Have you got that money upstairs with you?' and he said `Yes,'" that two negro boys in jail there had it, and "when they came back in [defendant's] presence, they brought the money, seven dollars; he owned up to it; he said he got the pocket-book; then he told us where we could find the pocket-book and the gun stock . . under some broom-straw . . and he says, `I put the pocket-book between where I got the flashlight and the house, I just scratched out a little piece and covered it with dirt.' And we went down there and found the gun stock in the broom-straw." They looked for the pocket-book, and "Mr. McClung just kicked a little dirt and says, `Here's your pocket-book.' I saw him pick it up;" it contained the registration card of the deceased. In talking to the defendant they did not threaten him or offer any inducement that he would get off lighter.
Ned Williams testified with reference to finding the seven dollars in money in the hands of the two negroes at the jail, which was "brought back to the presence of" the defendant; and that before any statement by the defendant no one had "offered him the remotest fear of punishment or the slightest hope of reward to get him to make the statement. . . He made the statements freely and voluntarily of his own accord." *Page 302 
For the defendant, there was testimony as to his good character and never having been in any trouble before.
Sam Smith, the stepfather, testified, that nothing had been said about arresting him when he and the defendant went in the car with the officers; that Ernest Clonts, the deceased, had been living at his house with the defendant the week before the shooting happened, on a Thursday, and on the previous Friday had an argument as to whether Clonts had "told Mr. Willard that [the defendant] shot his dog," which Clonts denied; that Clonts then said to the defendant, "You mess around me and I'll blow you out with my shotgun;" that they stopped their argument after the witness threatened "to take up a limb to both" of them, and he never heard any further argument; that on the morning of the Thursday Clonts was killed, Clonts had at the house of the witness "a black-handle switch-blade knife . . the blade . . is longer than an ordinary knife," and Clonts cut some shoes so they would not hurt the feet of the deceased; that the witness did not know what became of this knife; that the defendant "is sixteen or seventeen years old;" that the deceased had lived at his house five days; and that on the night of the killing the defendant acted "funny" when he came in the house, hung up the raincoat, "pulled his boots off, and grabbed the lamp and blowed it out, and went to bed."
Mary Smith, the defendant's mother, swore that he would be seventeen years old "the 24th of September coming," in 1943; that she heard arguing between him and the deceased at her house about a week before the shooting, and the deceased then said, "`I am going to get my clothes and go home. . . I'll have to kill you if I don't leave here.'. . I says `You and Jewbaby [the defendant's nickname] stop arguing; ain't neither one of you grown.'. . Ernest left that night, . . but he kept coming by there to go to work every morning. I saw him at our house the morning of the day he was killed. He had a black handle pocket-knife with a long blade in it, . . cutting on something. . . That was about five o'clock in the morning of the day he was killed that night. I don't know what they did after they left my house that morning." She "never heard of them having any more argument after the first they had and he left; as far as I know everything was all right from then on. I knew and [the defendant] knew that Ernest was going to the army in the next day or two." The defendant *Page 303 
"wore his boots that morning and this rubber coat; it is Sam's coat. He acted funny when he come in that night." When the officers came to the house and "asked about the gun . . I went and looked for it, and it wasn't there. It was [the defendant's] gun."
In rebuttal for the State, Jeanette Clonts, grandmother of the deceased, testified that he was living at her house at the time he was killed. "He didn't have a switch-blade knife that I ever seen. All I know, I didn't see it. He had an old wooden-handle thing, looked like it was made out of a saw or something. I don't know what went with it. That knife was at my house when he was killed, lying on the mantelpiece."
The defendant's statement to the jury was as follows: "We got to arguing Friday before I killed him, and he was going to go on and get his shotgun then and going to shoot me for telling about the dog, which I didn't know nothing about the dog. I went up there to haul some wood one day, and he asked me about the dog, and I told him we was hunting with him, and every time we would go to work I would carry the shotgun along, and I had a raincoat; it was raining that morning as we was going to work, and I decided to wear the raincoat to work. We come back that night; the gun was in the corner of the shop [the place where they left the truck in which they had been riding from work], and I got the gun out, and me and him went up the road together, and we argued all the way from down there in front of Mr. Ruffin's [the shop] and them, and we got to that mud hole and he put his lantern in his left hand and put his records under his left arm, and reached in his pocket and got his knife out, and held his right hand down to the lantern and opened his knife and started on me, and I wouldn't let him come on me with the knife, and I hauled off and hit him with the stock of the gun; he started to turn around, and when he turned around, I hauled off and shot him, and he fell and lay back, and he started to get back on his feet, and I went to whipping him with the gun. I hit him three or four licks, maybe five, with the gun; and Mr. Garmon [the deputy sheriff] and them come and got me then, and I told them where the gun and everything was."